## CHELSEA G.C.A. REALTY PARTNERSHIP, L.P. *v.* TOWN OF CLINTON

Superior Court, Judicial District of Middlesex
File No. CV-01 0095887S

Memorandum filed January 27, 2004

*Updike, Kelly & Spellacy,* for the plaintiff.

*Bennet, Wells & McDonnell,* for the defendant.

HON. ARNOLD W. ARONSON, JUDGE TRIAL REFEREE. The plaintiff in the present real estate tax appeal, CPG Partners, L.P., formerly known as Chelsea G.C.A. Realty Partnership, L.P., challenges the $45,674,142 valuation placed on Clinton Crossing Premium Outlets, the subject property, by the assessor for the defendant, the town of Clinton, on the list of October 1, 2000.

The subject property is an outlet center containing 47.3 acres of land with a 272,352 square foot retail facility that opened in 1996 at the junction of Interstate 95 and the Killingworth Turnpike in Clinton. The subject property consists of six buildings, excluding a maintenance shed and a septic system pump house. Five of the buildings in the outlet center are located in a village type setting having a nonvehicular "Main Street" with sidewalks, decorative plantings, traditional lighting fixtures, attractive storefronts, street signs showing merchant locations and extensive building overhangs to protect patrons in inclement weather. The sixth building is situated on the southerly portion of the site and is accessed by a pedestrian bridge and a vehicle bridge. Of the five buildings clustered around the central walkway, one is occupied by a single tenant: Saks Fifth Avenue Outlet.

Shopping centers are typically broken down into the following five categories: (1) *super regional malls.* These malls generally contain approximately 800,000 square feet of retail space and have four or five major anchor tenants. An example of a super regional mall is West Farms Mall, located partly in West Hartford and Farmington; (2) *regional malls.* A regional mall typically contains 500,000 square feet of retail space. This type of mall usually contains two or three large discount stores as anchor tenants; (3) *community centers.* These centers contain generally 200,000 to 300,000 square feet of retail space with one large discount store as the anchor tenant such as a Target or a K-Mart store; (4) *neighborhood centers.* These centers generally contain a large grocery store as the main tenant; and (5) *outlet centers.* Outlet centers represent about 1 percent of the shopping centers in the United States. There are approximately 250 such centers located in the United States whereas there are an estimated 2500 enclosed regional malls and 40,000 shopping centers overall.

An outlet center differs from a more conventional shopping center in three ways. The first is location. An outlet center is generally located in a nonurban location many miles from traditional shopping centers and malls. The second is physical design. Outlet centers generally have no anchor tenants and are better suited to many small tenants oriented to a "village concept." The third and final difference is business strategy. Outlet centers draw customers to a location that has a concentration of brand name factory stores that sell merchandise at prices well below those charged at traditional retail stores. These brand name outlet stores are used to liquidate merchandise coming out of traditional full price stores, sell overruns and, at times, act as a clearing house of inventory.

The typical purchasers of outlet centers are major investors such as large pension funds, institutional investors and real estate investment trusts. The investors tend to operate on a national scale because of the limited number of outlet centers in the nation and the limited number of investors. These typical national investors are more interested in the performance of the acquisition and, therefore, are more concerned with the evaluation of the actual income and expense data of prospective purchasers than they are of market sales of similar properties. Although both appraisers, Donald P. Bouchard for the plaintiff and Robert J. Mulready for the defendant town used the market sales approach to value the subject property in addition to the income approach, the market sales approach is inappropriate for determining the fair market value of the subject property on the date of the last revaluation, October 1, 2000. This is because investors, such as those purchasing outlet centers, are primarily interested in a return of profit from an acquisition.[1] Furthermore, the court

---

[1] "An investor is primarily interested in the return of profit from his or her investment in the acquisition of the subject [shopping center] property. . . . From that standpoint, it is most appropriate to focus on the income

finds a lack of credibility in Bouchard's use of four comparables. These four comparables were supplied to Bouchard by his client, the plaintiff, and all of the data pertaining to the four comparables used was also supplied to him by the plaintiff. Bouchard only inspected one of the four comparables that he used in determining the fair market value of the subject property using the market sales approach. The court attaches little credibility to the opinions of appraisers who rely on the client to furnish comparable sales rather than the appraiser who does his or her own independent research and analysis.

The four comparables used by Bouchard were located in different sections of the country subject to different economic factors. The first comparable was located in Gilroy, California, containing 578,179 square feet of gross leasable area. The second comparable was located in Michigan City, Indiana, containing 490,726 square feet of gross leasable area. Comparable number three was located in Waterloo, New York, containing 393,119 square feet of retail space. The fourth comparable was located in Kittery, Maine, containing 130,734 square feet of retail space. The four comparables were sold to the plaintiff as part of a package deal. The seller, Prime Retail, Inc., at the time of the sale, was in default of a $20,000,000 loan, which triggered cross defaults with other loans. The plaintiff purchased the four comparables for a total of $240 million. The four comparables contained 1.6 million square feet of gross leasable area and were 99 percent leased as of September, 2000. In using these four comparables to conduct a sales comparison approach to value, Bouchard arrived at a

approach in determining fair market value rather than the comparable sales approach." *Post Plaza Associates* v. *Wethersfield*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV 92-0511975 (July 12, 1996) (*Aronson, J.*), citing Appraisal Institute, The Appraisal of Real Estate (10th Ed. 1992) p. 413.

fair market value of the subject property of $40,035,744, which represents a square foot value of approximately $147 per square foot of gross leasable area. As previously stated, it is difficult to accept as credible comparable sales that have been selected by the client of the appraiser rather than the appraiser doing his or her own independent research and selection of sales deemed comparable.

Bouchard, Mulready and the court agree that the highest and best use of the subject property as of the date of the last revaluation on October 1, 2000, was its present use as an outlet center. Using this highest and best use, the income approach used by both appraisers is examined next. Both appraisers used the direct capitalization of income to arrive at value. Both appraisers conclude that the contract rent for the subject property was also the market rent.

Bouchard and Mulready used, for the most part, the income and expense information furnished to the town by the plaintiff in arriving at a net operating income. Bouchard selected a vacancy and collection rate of 5 percent whereas Mulready selected a 4 percent vacancy and collection rate, although the subject property in the year 2000 had few if any vacancies. The subject outlet center contained sixty-seven tenants and, according to Bouchard, had a total revenue for the year 2000 of $6,614,360 and a total expense of $1,761,139 to arrive at a net operating income of $4,522,503. Bouchard capitalized the net operating income with a capitalization rate of 11.25 percent to arrive at a total fair market value of the subject property as of October 1, 2000, at $40,200,029 rounded to $40,200,000. Bouchard then reconciled the values reached using different valuation techniques to arrive at an opinion of the fair market value of the subject property, as of October 1, 2000, of $40,000,000.

Mulready used a potential gross income of $6,917,347 less a 4 percent vacancy factor to arrive at an adjusted gross income of $6,709,391. Mulready concluded that the total operating expense for the subject property was $1,942,069 resulting in a net operating income of $4,767,322. Mulready capitalized the net operating income of $4,767,322 by a capitalization rate of 9.2 percent to arrive at a fair market value of the subject property, as of October 1, 2000, at $51,180,000.

The key issue in the present case, in arriving at the fair market value of the subject property as of October 1, 2000, is the determination of the capitalization rate. Bouchard selected his capitalization rate based upon the four comparables he used in the sales approach. Similarly, Mulready selected his capitalization rate based upon the comparables that he chose to use in performing his sales approach. Although Bouchard recognized that his 11.25 percent capitalization rate is relatively high compared to rates used for other types of shopping centers, he considered the higher risk associated with outlet centers because of their inability to adapt or to be converted to other forms of traditional retail uses. Although there is merit in Bouchard's position, for the credibility reasons discussed in considering the market sales approach used by Bouchard, the court cannot fully accept his conclusion of the higher capitalization rate of 11.25 percent.

Mulready derived his capitalization rate from the sale of four comparable shopping centers located in Connecticut. These shopping centers reflect a different retail target than that of outlet centers. Mulready's four comparables are: the Hamden shopping center on Dixwell Avenue in Hamden; a shopping center on New Britain Avenue, West Hartford, across the street from West Farms Mall and adjacent to Interstate 84; a shopping center known as Bishop's Corner at 333 North Main Street, West Hartford; and 175-215 Glastonbury

Boulevard, Glastonbury, located in the Somerset Square office and retail development. Using the market sales approach, Mulready arrived at a fair market value of $53,108,835 based upon a determination that the subject property had a square foot value of $195 compared to Bouchard's value of $147 per square foot. In arriving at his capitalization rate for the subject property, using the income approach, Mulready considered the capitalization rate from his four sales to range between 8 percent and 8.8 percent. Mulready also believed that, with a strong economy in the year 2000, rates had not changed locally. Mulready recognized that there were additional risks associated with the subject property due to a large number of leases expiring in the year 2001. He therefore chose a capitalization rate of 9.2 percent to compensate for these short term leases. Using the income capitalization approach with a rate of 9.2 percent and the net operating income of $4,767,322 previously arrived at, Mulready concluded that the fair market value of the subject property on October 1, 2000 was $51,818,718 rounded to $51,820,000.

The court recognizes that the valuation of real estate is a matter of approximation and that the determination of the capitalization rate in the present case lies somewhere between Bouchard's 11.25 percent and Mulready's 9.2 percent. It is noted that the publication used by Bouchard of the Korpacz Real Estate Investor Survey, a subsidiary of Price Waterhouse Coopers, shows prevailing capitalization rates for the National Power Center Markets to range between 8 percent and 11 percent over the years of 1997 through 2000. Considering all of these factors leads to the conclusion that a 9.9 percent capitalization rate, being an approximation between the Korpacz survey rates of 8 to 11 percent, is appropriate for use in this instance. Using Bouchard's net operating income of $4,522,503 divided by a 9.9 percent capitalization rate results in a fair market value of $45,681,848.

Considering this finding, the court cannot conclude that the plaintiff has been aggrieved by the valuation placed on its property by the assessor for the list of October 1, 2000.

Accordingly, judgment may enter in favor of the defendant town of Clinton denying the plaintiff's appeal without costs to either party.